UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

MICHAEL A. KOWALCZUK

        Plaintiff,                        Case No.: 2:19-cv-1230

vs.

SERGEANT ERIC GIESE, and
VILLAGE OF MOUNT PLEASANT

        Defendants

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

NOW COMES the plaintiff, Michael A. Kowalczuk, by and through his attorneys, Martin Law Office, S.C. and submits this memorandum of law in opposition to the defendants' motion for summary judgment. For reasons stated herein, disputed issues of material fact preclude summary judgment on the plaintiff's claims.

### FACTUAL BACKGROUND

On September 3, 2013, Michael Kowalczuk was driving home from a Labor Day bonfire. (*See* Def. "Statement of Proposed Material Facts" (hereinafter "SOPMF"), at 1.)[1] Michael Kowalczuk lived with his parents and his siblings, Nick and Rebecca, on a street called Sunset Boulevard in Racine, Wisconsin. (Plaintiff's Additional Proposed Findings of Fact (hereinafter "PPF", at 1.) It was after sunset. At the time, the defendant, Eric Giese, was working as a patrol

---

[1] The plaintiff's claims arise out of an arrest-incident that occurred on September 3, 2012. (*See* Def. "Statement of Proposed Material Facts" (hereinafter "SOPMF"), 1-37.) The incident was largely captured by the defendant's, Eric Giese's, squad camera, which was provided to the court. (Decl. of Andrew Yust, at 3., Ex. A.) Although the video shows what occurred between Giese and Kowalczuk, the audio from the footage is often difficult to discern and did not capture much of what was said during the incident.

officer with the Village of Mt. Pleasant. (SOPMF at 3.) Giese was enjoying his Labor Day alone in his squad car, listening to country music, when he observed Kowalczuk's car make a wide turn onto 16th Street. (SOPMF at 5.) He began to follow Kowalczuk. (Id.) The speed limit was 35 mph where Giese began to follow Kowalczuk, but it soon dropped to 25 mph. (PPF at 2.) Kowalczuk was driving 40 mph but did not slow when the speed limit changed. (Id. at 3.) Giese noticed this, and he activated his lights to pull Kowalczuk over for speeding. (SOPMF at 5.)

Kowalczuk had also noticed Giese; he saw Giese's patrol car following him for about 30 seconds before Giese activated the lights. (PPF at 3.) Kowalczuk did not immediately pull over when Giese turned on the lights—he did not feel safe pulling over at that spot (PPF at 4.) He knew that he was close to home and he wanted to stop where it was well lit. (Id. at 5.) Kowalczuk testified that he was going to pull over in front of his house and would listen to what "the officer had to say." (Id. at 6.) As Kowalczuk was driving toward his parents' home on Sunset, Giese activated the sirens. (SOPMF at 9.) Giese saw that Kowalczuk's car was registered to an address on Sunset. (Id. at 10.) Giese, however, did not verify to which address the car was registered. (PPF at 7.)

Kowalczuk eventually stopped his car over in front of his house on Sunset and slowly opened his door. (PPF at 9.) He did not intend to run away; he was nervous and does not know why he opened the door. (Id. at 10.) Officer Giese ran up to the car with his gun drawn and yelled conflicting instructions at Kowalczuk: "Stop! Stay in the car! Get out of the car right now!" (Id. at 11.) Officer Giese admits that his instructions were conflicting and testified that his intent was for Kowalczuk to stay in the car. (Id. at 11.) Giese instructed Kowalczuk to show his

hands. (Id. at 12.) Kowalczuk complied with each of Giese's instructions, as they were intended, and Giese testified that Kowalczuk did not resist. (Id. at 13.)

Giese nevertheless grabbed Kowalczuk's arm, forcing him from the car and onto the pavement. (Id. at 14.) As Giese was pulling Kowalczuk to the ground, Kowalczuk voiced his confusion: "What did I do, man?" (Id. at 15.) Kowalczuk was frightened and anxious. (PPF at 16.) On the ground, Kowalczuk eventually loosened his body and was able to comply with Giese's command to get on his stomach and put his hands behind his back. (PPF at 17.) Giese placed handcuffs on Kowalczuk, which remained secured during the events that followed. (Id. at 18.)

As Giese was arresting Kowalczuk, inside the house on Sunset, Kowalczuk's parents, Jeff and Nancy, and his siblings, Nick and Rebecca, heard the commotion outside. (Id. at 19.) Jeff and Nancy Kowalczuk were asleep in their pajamas. (Id. at 20.) Jeff Kowalczuk testified that he heard someone yelling: "Stay in the car, get out of the car" out of his window. (Id. at 21.) It is a quiet neighborhood, so it was easy to notice something like that. (Id. at 22.) Jeff and Nancy descended the stairs, out the front door, and onto their lawn; Nick and Rebecca followed. (Id. at 23.) Rebecca stayed on the front porch while Nancy and Jeff walked toward Giese and Kowalczuk. (Id. at 24.) The following photograph[2] shows the layout of the front yard of the Kowalczuk home from approximately where the incident occurred, which is not visible from Giese's squad camera:

---

[2] (PPF at 24; Kowalczuk Decl. at 4, Ex. 1.)



Jeff Kowalczuk testified what he was thinking as they saw it was Kowalczuk: "We were very fearful for our son, and we were asking him to, you know, to handle our kid with a little more kindness. Not in those words, but we were basically, you know, asking him to, you know, have a little compassion." (Id. at 25.) As Jeff and Nancy took position on the lawn, Nancy asked: "is everything ok?" (Id. at 26.) Officer Giese stood over Kowalczuk, and told Jeff and Nancy—who were still a good distance away—to: "Stay back! Stay back!" (Id. at 27.) Jeff and Nancy were shocked at Giese's agitation. (Id. at 28.) As Giese instructed Nancy and Jeff to stay back, Jeff saw Giese grab hold of Michael. (Id. at 29.) Jeff tried to calm Giese's apparent anxiousness, saying: "hey, hey, hey…" (Id. at 30.) Still, Giese began to reach for his gun, which Jeff noticed, prompting him ask: "are you going to shoot us?" (Id. at 31.)

Kowalczuk was laying on his stomach and heard Giese yelling: "Stay back! Stay back!" and reasoned it was his parents coming out of the house. (Id. at 32.) He leaned up to look for his mom and said: "help me." (Id. at 33.) After Giese yelled at Nancy and Jeff to stay back, Kowalczuk told Giese: "get off of me," at which point Giese told Kowalczuk: "stay the fuck down!" and tackled him to the pavement (Id. at 34.) Nancy was horrified as she saw Giese throw

4

Michael to the ground. (Id. at 35.) Regrettably, during the subsequent tussle, Kowalczuk kicked Officer Giese in the abdomen and genitalia. (Id. at 36; SOPMF at 28)[3] Jeff and Nancy Kowalczuk walked to the other side of Kowalczuk's car so they could see what was happening. (PPF at 37.) After Kowalczuk kicked at Giese, Giese punched Kowalczuk in the face. (SOPMF at 29.)

Jeff and Nancy saw Giese punch Kowalczuk in the face, and Jeff hurried around the car to see that Kowalczuk was ok, yelling: "Hey! Don't hurt him!" (PPF at 38.) Nancy continued to plead with Giese not to hurt Kowalczuk; she told Giese that Kowalczuk had a mental illness and difficulty following instructions and she asked Giese if he had children of his own. (Id. at 39.) Kowalczuk had not been diagnosed with a mental illness; however, his family had long observed that Michael gets easily overwhelmed, he does not do well in tense situations, he does not maintain eye contact, and, most importantly, he has difficulty following instructions. (Id. at 40.)

Rebecca, who stayed on the front porch recalls her parents pleading with Giese to stop. (Id. at 41.) From her vantage, she could see that Giese was much larger than Kowalczuk. (Id. at 42.) Rebecca did not hear her family make any threatening statements to Giese while Giese was forcefully arresting Kowalczuk. (Id. at 43.)

After Giese punched Kowalczuk, he stood up, drew his gun and told Jeff and Nancy to back up. (Id. at 44.) Jeff and Nancy immediately stepped back. (Id. at 45.) Kowalczuk then stood, faced Giese, and then stepped away—he was still handcuffed and terrified. (Id. at 46.)

Kowalczuk turned around to face his parents, intending to give up. (Id. at 47.) He was trying to tell then that he did not understand what was happening. (Id. at 48.) Kowalczuk did not intend to flee or make any movements to escape. (Id. at 49.) He was not resisting. (Id. at 50.) Jeff

---

[3] Kowalczuk subsequently pleaded "No Contest" and was found guilty of "battery of a peace officer" and "resisting or obstructing an officer." (Defendants' Statement of Stipulated Facts.)

5

and Nancy pleaded with Giese to stop. (Id. at 51.) Jeff put his hand up to his face and told Giese that Michael was not going to run away. (Id. at 52.)

Kowalczuk was turned around, handcuffed, telling his mom and dad: "I don't know…" when Giese, without warning, removed his taser, aimed it, and shot Kowalczuk in the back. (Id. at 53.) Kowalczuk fell straight down, his head bounced against the pavement knocking him out. (Id. at 54.) Jeff screamed: "No!" and Nancy yelled to her other son: "Oh my God, he just shot him!" (Id. at 55.)

As Kowalczuk laid unconscious, Nancy and Jeff continued to plead with Giese to show mercy. (Id. at 56.) When Kowalczuk regained consciousness, he clumsily began to stand. (Id. at 57.) Giese continued to instruct Kowalczuk to stay down. (SOPMF at 34.) However, Kowalczuk was disoriented and confused. (Id. at 58.) Kowalczuk did not intend to disobey Giese's instructions, as he slowly found his legs beneath him. (Id. at 59.) As Kowalczuk obliviously fumbled upward, Giese activated the taser a second time, knocking Kowalczuk back to the ground and onto his head. (SOPMF at 36.)

Nancy, seeing Kowalczuk's head strike the pavement again, was sure that Giese had just killed her son and began to yell: "Michael! Michael!" (PPF at 60.) Nancy could hear Rebecca, frozen on the porch, crying. (Id. at 61.) The Kowalczuk's began to yell at Giese, exclaiming that he did not "have to hurt Michael." (Id. at 62.) Kowalczuk regained consciousness and sat up. (SOPMG at 37.) Giese chose not to use the taser a third time even though Kowalczuk still failed to follow his instructions to stay down (Id.)

At no point during this incident did Kowalczuk's family intend to threaten, harm or interfere with Giese's arrest. (PPF at 63.) They came in peace. Nancy Kowalczuk will testify that

6

throughout the entire incident, her "husband and children were trying to deescalate the situation" and that they were asking "Giese to show mercy on Michael." (Id. at 64.)

## ARGUMENT

### I. Standard of Review

Summary judgment is proper only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(a). "Material facts" are those that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.*

The moving party bears the burden of proving the absence of a genuine dispute of material facts. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). If the moving party meets its burden of production, the burden then shifts to the nonmoving party to identify specific facts from which a fact finder could reasonably find in the nonmoving party's favor. *Celotex,* 477 U.S. at 324; *Anderson,* 477 U.S. at 252. At the summary judgment stage, the Court must "view the facts and draw reasonable inferences in the light most favorable to the [nonmoving] party. *Scott v. Harris,* 550 U.S. 372, 378 (2007). The Court must not weigh evidence or make determinations of credibility, as those are "jury functions, not those of a judge. *Anderson*, at 249-50 (1986).

A party asserting that a fact is genuinely disputed, or not disputed, must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an

7

> adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

Disputes may be resolved by incontrovertible video evidence. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Video evidence may be relied upon to resolve disputed facts when "[t]here are no allegations or indications that this videotape was doctored or altered in any way, nor any contention that what it depicts differs from what actually happened." *Id*. at 378-81. When presented with unaltered video evidence, a court must view "the facts in the light depicted by the videotape." *Id*.

## II. Viewing the Facts most Favorably to the Plaintiff, Giese's Use of a Taser Was Not Objectively Reasonable

The Fourth Amendment, as applied to the states by the Fourteenth Amendment, protects against unreasonable seizures. *Graham v. Connor*, 490 U.S. 386, 394 (1989). The Fourth Amendment's reasonableness standard applies, which is concerned with whether the force used "was objectively reasonable" from the perspective of a reasonable officer. *Baird v. Renbarger*, 576 F.3d 340, 344 (7th Cir. 2009). Determining whether the particular force was "reasonable" under the Fourth Amendment requires a balancing of "the nature and quality of the intrusion on the individual's Fourth Amendment interests" against the countervailing governmental interests at stake. *Graham*, 490 U.S. at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). The reasonableness inquiry is an objective one: "the question is whether the officers' actions are

8

'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham,* 490 U.S. at 397. Whether force is "objectively" reasonable "is a legal determination rather than a pure question of fact for the jury to decide." *Phillips v. Cmty. Ins. Corp.,* 678 F.3d 513, 520 (7th Cir. 2012).

The court's examination "requires careful attention to the facts and circumstances of each particular case" with focus on three factors, including: [1] "the severity of the crime at issue," [2] "whether the suspect poses an immediate threat to the safety of the officers or others," and [3] "whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham,* 490 U.S. at 396. "An officer's use of force is unreasonable if, judging from the totality of the circumstances at the time of the arrest, the officer uses greater force than was reasonably necessary to effectuate the arrest." *Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 519 (7th Cir. 2012) (citing *Gonzalez v. City of Elgin*, 578 F.3d 526, 539 (7th Cir. 2009))

The arresting officer's subjective intentions will not render objectively unreasonable force constitutional. "Even when officers' goals are eminently reasonable, there are definite limits to the force officers may use to prod arrestees into obeying commands. A rule that pins reasonableness on whether officers used the force necessary to secure compliance would be a rule that requires officers to beat non-resisting arrestees into submission." *Phillips*, 678 F.3d at 527.

Analyzing this case under the three *Graham* considerations and viewing the facts in the light most favorably to the plaintiff, Sergeant Giese's use of force in arresting and tasering Michael Kowalczuk was not *objectively* reasonable.[4]

---

[4] The Defendants' memorandum argues that the potential claims of excessive force, prior to Giese's use of a taser are *Heck* barred. (Dkt. 25, Def. Memo. at 6-8.) The plaintiff does not separately address this argument because this issue was previously decided by this Court:

9

A.  *Severity of the Crime at Issue*

The first factor to examine is the severity of the underlying crime. Kowalczuk's underlying crimes were traffic infractions. (PPF at 2-3.) Giese testified that he did not have any suspicion that Kowalczuk had committed a violent crime before stopping him and that it only crossed his mind that Kowalczuk could be intoxicated. (Id. at 65.) Despite the relatively low seriousness of the underlying crimes, Giese aggressively approached Kowalczuk, with his gun drawn, and provided confusing instructions before ripping him from his car. As Kowalczuk will testified: he was "frightened and anxious." This set the tone for the events that followed.

B. *Whether the suspect poses an immediate threat to the safety of the officers or others*

At the time Giese tasered Kowalczuk, there was no immediate threat. Kowalczuk had stopped resisting, he had separated himself from Giese, he was turned around, he was unarmed, and he was handcuffed. Kowalczuk's parents were maintaining distance and were pleading with Giese to recognize that Kowalczuk was confused but was not going to flee.

---

> This might be true if Kowalczuk's version of events ended when he kicked Giese during the tussle on the ground. Until that point in time, Kowalczuk alleges that he resisted Giese's commands to get and stay on the ground, and he resisted Giese's control by kicking him. Applying the rule from *Ferguson* to this case, if Giese had used excessive force during that time (and therefore acted unconstitutionally), Kowalczuk could not have been convicted of resisting. But Kowalczuk's allegations about the remainder of the incident, after he stopped resisting, fall outside of *Ferguson*.
>
> Specifically, Kowalczuk's additional allegations that his back was turned to Giese when Giese shot him with a taser, unprovoked, could plausibly support judgment in his favor on his excessive force claim without undermining his convictions. [*Citation Omitted*]

(Dkt. 17, Order at p. 8.) Pursuant to the Court's order and consistent with Kowalczuk's pleas of "No contest", Kowalczuk cannot, and does not, claim that Officer Giese's actions (including the punch) that occurred while Kowalczuk resisted and kicked Giese on the ground form a basis for his excessive force claim.

10

Giese reports that there were multiple reasons that he used the Taser, including "to bring Kowalczuk under control and keep him from fleeing the scene." (SOPMF at 50.) Specifically, he cited two reasons, including that he was "physically assaulted by Kowalczuk and that he felt physically threatened by an adult male relative of Kowalczuk." (Id. at 51.) At his deposition, Giese testified:

> Based on the situation of his assaultive behavior, his continuous active resistance, the father that came out and was going to punch me, being outnumbered, I could have utilized my baton, I could have struck him multiple more times with my knees, legs or fists. If I had a canine at the time, I could have deployed my canine to bite any of the individuals as well. And did I say baton?

(PPF at 66.)

Kowalczuk does not dispute that he kicked Giese—he did. However regrettable Kowalczuk's action, Giese's responding force must nevertheless be reasonable. Viewing the facts in the light most favorable to the plaintiff, a reasonable officer would not have believed Kowalczuk to be a continuing threat at the time Giese disengaged with Kowalczuk. Kowalczuk had separated himself and turned his back to Giese. Kowalczuk's family was telling Giese that Kowalczuk was confused and not going anywhere.

Giese further credits the presence of Kowalczuks' concerned family, specifically his father, Jeff Kowalczuk, as added justification for tasering Kowalczuk. As the Kowalczuk's will testify, no one intended to threaten, harm or interfere with Giese. Although Jeff Kowalczuk had briefly come around the car, he immediately retreated. At the time Giese used his taser, Jeff Kowalczuk was behind the car with his hands to his face, pleading with Giese. The Kowalczuk's reacted as any reasonable and concerned family would: with concern. They did not act with violence. A jury, weighing the credibility of the Kowalczuk's testimony, could find that no reasonable officer would have interpreted them as a threat.

11

Regarding the second use of the taser, the justification for this use is further attenuated from any conceivable risk of harm. A reasonable officer would have observed that Kowalczuk had been knocked unconscious and that the Kowalczuk family had remained at a sorrowful distance. A reasonable officer would have observed that, when Kowalczuk was standing up, he was confused and hurt. A jury, weighing the credibility of the Kowalczuk's could find that the second use of the taser was unreasonable because no officer would have perceived a threat of harm.

The defendants' justification for the use of the taser in this case comes down to two disputed issues of fact: whether Kowalczuk was actively resisting and whether Kowalczuk's family posed a risk to Giese's safety. The video shows how the force escalated—beginning with Giese's forceful removal of Kowalczuk from his car—but it does not show why. This is because the audio is unclear. According to the Kowalczuks' testimony Giese had no reasonable basis to have escalated the force to the point that he tasered Kowalczuk. At that time, Kowalczuk, although frightened, had separated himself from Giese and was giving himself up.

B. *Active Resistance or Fleeing*

Kowalczuk was not resisting and he was not fleeing when he was tasered. According to the Kowalczuk's the incident had ended when Giese tasered Kowalczuk from behind.

There is no question that Kowalczuk resisted Giese, just as there is no question that Kowalczuk kicked Giese. The dispute is not whether Kowalczuk ever resisted Giese, but whether he was actively resisting Giese when Giese shot him with a taser. At that time, Jeff Kowalczuk was pleading with Giese to recognize that Kowalczuk was not going anywhere. Nancy Kowalczuk had been telling him that Kowalczuk was confused and had difficulty following instructions, and the Kowalczuks were all asking Giese not to hurt Kowalczuk. Kowalczuk was

12

not intending to run. He was scared and he was telling his parents that he was confused when Giese unholstered the taser and shot him. Under this view of the facts, Giese should have recognized that Kowalczuk was no longer resisting or fleeing.

The same holds true for the second time that Giese used the taser to knock Kowalczuk to the ground. When he first tasered Kowalczuk, Giese saw him fall, hands cuffed behind his back, and strike his head. Yet, he did it again. Viewing the facts in the light most favorably to the Kowalczuk, the use of taser deployments on an unarmed, non-resisting, and handcuffed individual is not a reasonable use of force.

### III. Qualified Immunity

Qualified immunity shields officials from civil liability if the conduct does not violate clearly established statutory or constitutional rights of which a reasonable officer would have known. *Gill v. City of Milwaukee*, 850 F. 3d 335, 340 (7th Cir. 2017). Qualified immunity looks to two questions: [1] whether the facts, taken in the light most favorable to the plaintiff, constitute a violation of a constitutional right, and [2] whether that right was clearly established at the time of the violation. *Id.* "When looking at closely analogous cases to determine if a right was clearly established at the time of violation, we look first to controlling precedent on the issue from the Supreme Court and to precedent from this Circuit." *Estate of Escobedo v. Bender,* 600 F.3d 770, 781 (7th Cir. 2010).

It is clearly established in the Seventh Circuit that the deployment of a Taser against a misdemeanant who is not actively resisting is a Fourth Amendment violation. *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 863 (7th Cir. 2010); *Abbott v. Sangamon Cnty*, 705 F.3d 706, 732 (7th Cir. 2013). "Force is reasonable only when exercised in portion to the threat posed." *Cyrus v. Town of Mukwonago*, 624 F. 3d 856, 863; *Sallenger v. Oakes,* 473 F.3d 731, 741-42 (7th

13

Cir.2007) (noting that the fact that the force was applied *after the arrestee was handcuffed* was a significant factor in denying immunity.) The law is further clear that police officers who unreasonably create a physically threatening situation in the midst of a Fourth Amendment seizure are not immunized from the use of excessive force. *Starks v. Enyart*, 5 F.3d 230, 234 (7th Cir. 1993). Viewing the facts in the light most favorable to Kowalczuk, the escalation of force by Giese, including the ultimate deployment of the taser after Giese had stopped resisting and was handcuffed, was a violation of Kowalczuk's clearly established rights.

This case turns entirely on whether or not a reasonable officer would have perceived Kowalczuk to have stopped resisting and fleeing *at the time* Giese shot him with the taser. If so, there can no question that Kowalczuk, who was already handcuffed, had a clearly established right not to be tasered. If the testimony of the Kowalczuk family were to be believed, a reasonable officer in Giese's shoes would have understood that Kowalczuk did not pose an ongoing threat of harm or flight and that further force was entirely unnecessary. Because the facts are to be viewed in this light, qualified immunity should not be granted.

### IV. *Monell* Liability

A local governing body may be liable for monetary damages under § 1983 if the unconstitutional act complained of is caused by: [1] an official policy adopted and promulgated by its officers; [2] a governmental practice or custom that, although not officially authorized, is widespread and well settled; or [3] an official with final policymaking authority. *Thomas v. Cook County Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010), citing *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 690. In order for a *Monell* claim to exist, there must be a casual link between the municipal policy or custom and the constitutional violation. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 109 S. Ct. 1197 (1989). A *Monell* claim may arise due to

14

inadequacy of the training of its officers. Id. A municipality can be liable if its failure to train, supervisor or discipline exhibits deliberate indifference to the constitutional rights of its inhabitants. *Id.* Here, the use of excessive force was due to inadequate training, supervising, of the use of force as it relates to Tasers. See *Gable v. City of Chicago*, 296 F.3d 531, 537 (7th Cir. 2002). Deliberate indifference may take the form of an implicit policy. *Phelan v. Cook County*, 463 F.3d 773, 790 (7th Cir. 2006).

In support of its motion for summary judgment, the defendants fundamentally argue that Mt. Pleasant police officers reviewed the incident and found that Giese's use of the Taser against Kowalczuk was consistent with its policies and training:

> Chief of Police Matthew Soens reviewed Officer Giese's training records, including his training on the use of Tasers. Chief Soens confirmed that Officer Giese's training was up to date as of the date of the incident. In fact, Officer Giese is now a law enforcement instructor on the use of Tasers. Sergeant David Viccarro was Officer Giese's supervisor on the date of the incident. Sergeant Viccarro confirmed that Officer Giese was supervised according to department policies and in the same manner as any other officer under his supervision. Sergeant Vaccarro also reviewed the dashcam footage following the incident and found no fault with Officer Giese's actions or decision to use a Taser.

(Dkt. 25, Def. Memo. at 15.) To the extent that Giese's use of the taser against Kowalczuk was unconstitutional but consistent with department policy and training, it follows that the training and policies that authorized and caused the use of the taser were unconstitutional.

## V. Punitive Damages

As the defendants note, punitive damages are "appropriate when the defendant acted wantonly and willfully" in violating the plaintiff's constitutional rights. *Hendrickson v. Cooper*, 589 F. 3d 887, 894 (7th Cir. 2009). Viewing the facts in the light most favorably to Kowalczuk, a jury could find that Giese's escalation of force and deployment of the taser, despite the pleas from Kowalczuk's family constitutes a knowing and a willful act. The defendants' argument for

summary judgment on this claim fails for the same reason that the motion fails in its entirety: there are disputed issues of material fact. Giese will argue that his actions were born from a reasonable fear for his safety. However, a jury, having the opportunity hear the testimony of the Kowalczuk family and other witnesses to this incident could find that no reasonable officer would have felt threatened by the Kowalczuk family and that that Giese's actions were willful in light of the fact that Kowalczuk had given himself up and was handcuffed when he was tasered, twice.

## CONCLUSION

For the reasons stated herein, the Court should deny the defendants' motion for summary judgment.

Dated: July 1, 2020     **MARTIN LAW OFFICE, S.C.**
Attorney for Plaintiff(s)

*Electronically Signed by Drew J. DeVinney*

_____

Drew J. De Vinney
State Bar No. 01088576

ADDRESS
7280 S. 13th St., Ste.102
Oak Creek, WI 53154
414-856-2310 (office)
414-856-2677 (direct fax)
drew@martin-law-office.com