| | |
|---|---|
| MICHAEL A. KOWALCZUK,<br><br>        Plaintiff,<br><br>v.<br><br>ERIC GIESE and VILLAGE OF MOUNT PLEASANT,<br><br>        Defendants. | Case No. 19-CV-1230-JPS<br><br>**ORDER** |

### 1.  BACKGROUND

On August 23, 2019, Michael Kowalczuk ("Plaintiff") brought this action against Officer Eric Giese and the Village of Mount Pleasant, Wisconsin (collectively, "Defendants") pursuant to 42 U.S.C. § 1983. (Docket #1). After Defendants filed a motion to dismiss, (Docket #5), Plaintiff filed an amended complaint, (Docket #11). Plaintiff alleges that Officer Eric Giese ("Giese") violated his Fourth and Fourteenth Amendment rights by using excessive force against him. (Docket #11 at 1, 6–7). Plaintiff also seeks punitive damages from Giese. (*Id.* at 8). Lastly, Plaintiff brings a *Monell* claim against the Village of Mount Pleasant (the "Village"). (*Id.* at 7–8). On June 1, 2020, Defendants filed a motion for summary judgment, (Docket #24), which the parties have fully briefed. For the reasons explained in the balance of this Order, the Court will grant Defendants' motion.

### 2.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The court construes all facts and reasonable inferences in the light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). "The court must not weigh the evidence presented or determine credibility of witnesses; the Seventh Circuit instructs 'that [the court] leave[s] those tasks to factfinders.'" *H–D U.S.A., LLC v. SunFrog, LLC*, 311 F. Supp. 3d 1000, 1010 (E.D. Wis. 2018) (quoting *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010)). "[T]he non-movant need not match the movant witness for witness, nor persuade the court that [his] case is convincing, [he] need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact." *Waldridge v. Am. Hoeschst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994).

## 3. RELEVANT FACTS

Plaintiff's complaint stems from an incident that occurred around 12:30 a.m. on September 3, 2013. (Docket #28-4 at 5). Plaintiff was driving to his house in Mount Pleasant, Racine County, Wisconsin, where he lived with his parents and siblings. (Docket #39 at 1, #43 at 1). Plaintiff was returning from a bonfire in Oak Creek, Wisconsin, during which he had consumed a couple of beers. (Docket #39 at 1).

That night, Giese, a Village police officer, reported seeing what was later identified as Plaintiff's vehicle make a wide, eastbound turn onto 16th

Street and accelerate as it passed by Giese's squad car. (*Id.* at 2).[1] Giese, who was on patrol, began to follow Plaintiff. (*Id.*, Docket #43 at 1). At this location on 16th street, the speed limit drops from 35 miles per hour ("mph") to 25 mph. (Docket #43 at 1). Because Plaintiff, who was driving at 40 mph, failed to reduce his speed, Giese activated his lights to initiate a traffic stop. (*Id.* at 1). Giese followed the vehicle with only the squad car lights on for approximately two tenths of a mile. (Docket #39 at 2). Plaintiff testified that he did not pull over immediately because he did not feel safe, and, knowing that he was close to home, wanted to stop at a well-lit road. (Docket #43 at 2).

    As the two vehicles approached Green Bay Road, Plaintiff turned on his right turn signal. (Docket #39 at 2). However, Plaintiff did not come to a complete stop at a red light before turning right. (*Id.* at 2). Giese then activated the sirens on his squad car. (*Id.* at 3, Defendants' Exhibit A).[2] Plaintiff continued to drive, eventually turning and pulling over onto Sunset Boulevard. (Defendants' Exhibit A). Giese verified the vehicle's

---

[1] Throughout Plaintiff's Responses to Defendants' Statement of Proposed Material Facts, the parties repeatedly cite to "Deposition of Michael Kowalczuk, 44 (II 2-11), Ex. 5" to support several of their propositions. Page 44 of Plaintiff's Deposition supports the proposition that Plaintiff believes that nothing in the incident report from September 3, 2013, Deposition Exhibit Number 5, is inaccurate. (Docket #28-1 at 12). However, the relevant incident report was not submitted as "Exhibit 5" to the Court. Rather, this exhibit can be found within (Docket #28-4). Essentially, Defendants failed to correctly cite to a number of their propositions, and Plaintiff similarly erred as to multiple facts in opposition. Nevertheless, because (1) the majority of facts in this case are undisputed by both parties and (2) Defendants submitted to the Court dash camera footage of the incident that gave rise to Plaintiff's claims, the Court determines that such inaccuracies do not compromise the sufficiency of the factual record before it.

[2] Defendants' Exhibit A is dash camera footage of the incident that Defendants submitted to the Court via a USB flash drive.

registration and reported learning that the vehicle was registered to an address on that street, although he did not know the specific address to which it was registered. (Docket #39 at 3, #40-2 at 37–38). Ultimately, Plaintiff pulled over in front of his house and claimed that he was going to listen to what "the officer had to say." (Docket #43 at 2). It was just over twenty seconds from the time Giese turned on his sirens until Plaintiff pulled over in front of his home. (Defendants' Exhibit A).

Next, Plaintiff opened the car door. (*Id.*) In his declaration, Plaintiff claimed that he did not intend to run away when he parked his car, but that he was scared. (Docket #43 at 3). Further, he admitted that he did not have a rational reason for opening the car door. (*Id.*) Giese, who believed that Plaintiff may be driving impaired, alleges that he knew from his training and experience that intoxicated drivers often try to make it home before stopping in an attempt to flee and run into their homes before being apprehended. (Docket #39 at 3, #40-2 at 71).

As Plaintiff opened his car door, Giese approached with his weapon drawn and shouted conflicting instructions to Plaintiff to "Stop! Stay in the car! Get out of the car right now!" (Defendants' Exhibit A). Giese ordered Plaintiff to show Giese his hands and Plaintiff complied. (*Id.*) The video footage shows Giese, with his gun drawn, walk to Plaintiff, who was seated in the car, and grab Plaintiff by either his hand or arm. (*Id.*) Giese simultaneously put his gun back in its holster. (*Id.*) He then commanded Plaintiff to get out of the car, to which Plaintiff replied, "What'd I do, man?" (*Id.*) Giese repeatedly commanded Plaintiff to get on the ground and then physically directed Plaintiff to do so, shouting "Get on the fucking ground!" (*Id.*) The parties dispute whether Plaintiff complied with this instruction or actively resisted Giese's command. (Docket #39 at 4).

Next, Giese ordered Plaintiff to get on his stomach and put his hands behind his back. (*Id.* at 5, Docket #43 at 4). Plaintiff, who alleges he was frightened and anxious, admits that he initially resisted this instruction but eventually complied. (Docket #39 at 5, #43 at 4). Further, Plaintiff admits that Giese told him that Plaintiff needed to place his hands behind his back, get on his stomach, or that he would be tased. (Docket #39 at 5).

At this juncture, Giese was able to handcuff Plaintiff, and those handcuffs remained secured. (*Id.*, Docket #43 at 4). Giese testified that he saw three people approach the scene. (Docket #40-2 at 73–74). The dash camera footage shows two people, later identified as Plaintiff's parents, Jeff Kowalczuk ("Jeff") and Nancy Kowalczuk ("Nancy"), approach first. (Defendants' Exhibit A).

After Giese twice shouted at them to stay back, Jeff and Nancy stopped. (*Id.*) Next, Plaintiff began to get up off of the ground. (*Id.*) As Giese tried to redirect Plaintiff back to the ground, he again told Plaintiff's parents to stay back. (*Id.*) Jeff then shouted, "Hey, hey, hey!" and took a couple of steps towards Giese and Plaintiff. (*Id.*) As Plaintiff moved on the ground, Jeff shouted, "Are you going to shoot us?" (*Id.*) Plaintiff then attempted to get up, prompting Giese to shout, "Stay the fuck down!" and physically direct Plaintiff back towards the ground. (*Id.*) Thereafter, the two began to "scuffle." (*Id.*, Docket #39 at 6). As this happened, Jeff, Nancy, and Plaintiff's brother walked towards Plaintiff and Giese. (Defendants' Exhibit A).

Although this altercation took place directly in front of the dash camera, the lighting compromised the clarity of the footage of this portion of the incident. But the video clearly shows Giese punch Plaintiff at least once in the face. (*Id.*) However, Plaintiff claims that Giese hit him more than once. (Docket #28-1 at 9). Plaintiff admits that he kicked Giese twice during

this altercation, although he does not remember where. (Docket #39 at 7). Giese claims that Plaintiff kicked him in the leg and genitalia. (Docket #40-2 at 80). While it is unclear where such kicks landed, the footage shows Plaintiff kick in Giese's direction a couple of times during this struggle. (Defendants' Exhibit A).

Right after Giese punched Plaintiff, Jeff ran around the front of Plaintiff's vehicle towards Giese and Plaintiff, saying "Hey, don't hurt him!" (*Id.*) Although not clearly depicted on camera, both Giese and Plaintiff state that Jeff had clenched at least one of his fists. (Docket #28-1 at 10, #40-2 at 82–83). Jeff does not recall doing so. (Docket #40-1 at 12). Jeff subsequently retreated and Giese and Plaintiff separated from one another. (Defendants' Exhibit A). Nancy alleges that throughout this incident, she pleaded with Giese not to hurt her son because he had a mental illness and difficulty following instructions and asked if Giese had children of his own. (Docket #43 at 9). However, such statements cannot be heard on the video. Moreover, Nancy declared that her son had not been diagnosed with a mental illness, but that he gets easily overwhelmed, does not do well in tense situates, cannot maintain eye contact, and has difficulty following instructions. (*Id.*)[3]

---

[3]Defendants argue that the Court cannot credit statements that cannot be heard on the dash camera footage. (*See, e.g.,* Docket #43 at 9). As discussed, *infra*, pursuant to *Scott v. Harris*, 550 U.S. 372, 380 (2007), the Court cannot credit a party's version of events to the extent such events are "blatantly contradicted" by the video. Yet the Court's inability to clearly hear certain comments due to the poor audio quality of the video does not amount to a "blatant contradiction" as to several remarks allegedly made by Plaintiff and his family.

According to the footage, Plaintiff took a couple of steps towards Giese, causing Giese to walk backwards.[4] (*Id.*) Plaintiff then turned around and walked in the opposite direction, towards his family, saying "I don't know . . . ." (*Id.*, Docket #43 at 12). Plaintiff admits that Giese commanded him to stay on the ground at this time. (Docket #28-1 at 9). As Plaintiff walked away, Giese deployed his Taser into Plaintiff's lower back, causing Plaintiff to fall forward onto the ground. (Defendants' Exhibit A, Docket #39 at 7–8, #43 at 12). Giese avers, and Plaintiff admits, that the back is the preferred location for Taser deployment, as it minimizes the risk of unintended injury from Taser leads. (Docket #39 at 8). Plaintiff claims to have struck his head and lost consciousness due to being tased and falling to the ground. (Docket #36 at 2).

As Plaintiff lay on the ground, his parents claim to have "plead[ed] with Giese to show mercy" on their son. (Docket #43 at 13). Giese testified that Jeff threatened him after Giese first deployed his Taser. (Docket #40-2 at 86–87). Jeff admitted to threatening Giese, telling him to come back over when he was off of work so Jeff could take him on when Giese was off duty. (Docket #40-1 at 14). Shortly thereafter, Plaintiff started to get up off of the ground and onto his feet, facing Giese, and Giese shouted at Plaintiff to stay

---

[4]In its Order on Defendants' motion to dismiss, the Court noted that the parties' respective accounts diverged as to whether Plaintiff walked towards Giese after getting up from the ground, but prior to being tased. (Docket #16 at 8–9). The footage shows Plaintiff take a few steps towards Giese after getting up off of the ground. "When the record evidence includes a videotape of the relevant events, the Court should not adopt the non-movant's version of the facts when that version contradicts what is depicted on the videotape." *Williams v. Brooks*, No. 1:13-cv-01592-JMS-DKL, 2015 WL 1013963, at *2 (S.D. Ind. Mar. 9, 2015) (citing *Scott*, 550 U.S. at 379–80).

down. (Defendants' Exhibit A). Plaintiff claims that he did not intend to disobey Giese's instructions. (Docket #43 at 13). His family avers that Plaintiff did not know what he was doing or where he was because he was concussed. (Docket #39 at 8, #43 at 13). Giese then deployed another Taser cycle to Plaintiff, causing him to return to the ground. (Docket #39 at 8–9).

Plaintiff's family stayed near the front of Plaintiff's vehicle and were pointing and talking with Giese. (Defendants' Exhibit A). Eventually, Plaintiff started to sit up and Giese told him to stay down. (*Id.*) Plaintiff remained in a seated position until more officers arrived. (*Id.*) The parties do not dispute that, up until that time, Giese was the only officer on the scene. (Docket #39 at 9). Plaintiff was subsequently transported to the hospital. (Docket #28-4 at 8). At the hospital, Plaintiff had a blood alcohol level of .106. (Docket #39 at 11). Once the hospital cleared Plaintiff, he was turned over to Racine County Jail and held there on multiple charges. (Docket #28-4 at 8–9).

Thereafter, Plaintiff pleaded no contest to, and was convicted of, operating while intoxicated in Mount Pleasant municipal court. (Docket #7-2, #27). Further, on January 9, 2015, Plaintiff pleaded no contest to, and was convicted of, battery of a law enforcement officer, resisting or obstructing an officer, and bail jumping. (*Id.*); *See also Wisconsin v. Kowalczuk*, Case No. 2013CF1200, (Racine Cnty. Cir. Ct.) *available at* https://wcca.wicourts.gov/ (last visited Mar. 27, 2021).

After the incident with Plaintiff, Giese's supervisor, Sergeant Jason Vaccaro ("Vaccaro") reviewed the footage of this incident. (Docket #39 at 9). Vaccaro found no fault with Giese's actions or his decision to use a Taser under the circumstances. (*Id.*) Similarly, Officer Matthew Soens ("Soens"), now the Village's Chief of Police, reviewed Giese's training records and

determined that, at the time of the incident, the records were up to date—including Giese's training on Taser use. (*Id.*) Giese is now a sergeant with the Village and instructs other officers on Taser use. (*Id.*)

## 4. ANALYSIS

### 4.1 Plaintiff's Excessive Force Claim

In Plaintiff's amended complaint, he alleges that Giese violated his Fourth and Fourteenth Amendment rights by using excessive force. (Docket #11 at 6). In his response brief, Plaintiff clarifies that he brings his excessive force claim only as to when Giese deployed his Taser. (Docket #33 at 9).[5] Defendants argue that this Court should grant summary judgment in their favor because Giese's actions (1) were objectively reasonable and (2) are protected by qualified immunity. (Docket #25 at 8–14). Because the Court determines that Giese's actions are protected by qualified immunity, the Court need not address the issue of whether Giese's actions were objectively reasonable as a matter of law.

The qualified immunity doctrine protects government officials from civil liability when they perform discretionary functions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v.*

---

[5]Plaintiff cites to this Court's prior Order, (Docket #16), which explained that Plaintiff's claims of excessive force through the time Plaintiff and Giese struggled on the ground are barred by *Heck v. Humphrey*, 512 U.S. 477 (1994). Under the doctrine announced in *Heck*, a § 1983 action must be dismissed where the plaintiff has been convicted of an underlying criminal charge, and judgment in favor of the plaintiff in his civil action "would necessarily imply the invalidity of his conviction or sentence[.]" 512 U.S. at 487. Therefore, Plaintiff acknowledges that, pursuant to his convictions resulting from this incident, he "cannot, and does not, claim that Officer Giese's actions (including the punch) that occurred while [he] resisted and kicked Giese on the ground form a basis for his excessive force claim." (Docket #33 at 9–10 n.4).

*Fitzgerald*, 457 U.S. 800, 818 (1982). "Put simply," says the Supreme Court, "qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Once the defense is raised, the plaintiff bears the burden to defeat it. *Weinmann v. McClone*, 787 F.3d 444, 450 (7th Cir. 2015).

To determine the applicability of qualified immunity at the summary-judgment stage, a court must engage in a two-part analysis to determine whether (1) the facts, viewed in the light most favorable to the non-movant, establish the violation of a constitutional right, and (2) the constitutional right at issue was "clearly established" at the time of the official's purportedly illegitimate conduct. *Leiser v. Kloth*, 933 F.3d 696, 701 (7th Cir. 2019). A right is clearly established when its contours are "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (internal quotations and alterations omitted). Courts should "not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011). The Supreme Court emphasized "the longstanding principle that 'clearly established law' should not be defined 'at a high level of generality.'" *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (quoting *Ashcroft*, 563 U.S. at 742). The "clearly established law" must instead "be particularized to the facts of the case." *White*, 137 S. Ct. at 552 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

Notably, "[a]s applied to a Fourth Amendment excessive-force claim, the qualified-immunity doctrine gives 'enhanced deference to officers' on-scene judgments about the level of necessary force.'" *Dockery v.*

*Blackburn*, 911 F.3d 458, 466 (7th Cir. 2018) (quoting *Abbott v. Sangamon County*, 705 F.3d 706, 725 (7th Cir. 2013)). Thus,

> even if the plaintiffs demonstrate that excessive force was used, they must further establish that it was objectively unreasonable for the officer to believe that the force was lawful—i.e., they must demonstrate that the right to be free from the particular use of force under the relevant circumstances was 'clearly established.'

*Abbott*, 705 F.3d at 725. Pursuant to Seventh Circuit precedent, the Court separately analyzes whether each of Giese's Taser deployments were objectively unreasonable. *See, e.g., Dockery*, 911 F.3d at 467–68.

### 4.1.1 The First Taser Deployment

After construing all facts in Plaintiff's favor, the Court finds that Giese did not violate a clearly established right when he first deployed his Taser on Plaintiff. It is undisputed that, at this juncture, Plaintiff had already actively resisted Giese by (1) not immediately pulling over when Giese initiated the traffic stop, (2) initially resisting Giese while he was on the ground, (3) getting up as others came to the scene, despite Giese's commands for him to stay on the ground, and (4) struggling with Giese on the ground and kicking him.

The Court's determination is in accord with Seventh Circuit case law, which makes clear that an officer does not violate a clearly established right when he or she uses a Taser on an actively resisting subject. *See Abbott*, 705 F.3d at 727–28 (collecting cases). For example, in *Dockery*, 911 F.3d at 467, the Seventh Circuit found that it was objectively reasonable for the officer to deploy her Taser on the plaintiff. The plaintiff claimed that he was not actively resisting; however, video footage showed that he was uncooperative and physically aggressive, rocking back and forth, and twice

escaping multiple officers' grasps. *Id.* After falling backwards, the plaintiff "wildly kicked" in the officers' direction and "immediately jumped to his feet." *Id.* The Seventh Circuit "had no difficulty concluding that the first use of the Taser was protected by qualified immunity," based on those circumstances. *Id.*

On the other hand, the Seventh Circuit has held that it is unreasonable for officers to use force on passive subjects. *See Rambo v. Daley*, 68 F.3d 203, 207 (7th Cir. 1995) ("The Constitution clearly does not allow police officers to force a handcuffed, passive suspect [who did not attempt to flee or physically resist the officers] into a squad car by breaking his ribs."). In *Cyrus v. Town of Mukwonago*, the Seventh Circuit found that the district court's grant of summary judgment was inappropriate because there was no evidence suggesting that the subject violently resisted the officers. 624 F.3d 856, 863 (7th Cir. 2010). The court also noted that the officer who used his Taser "was familiar" with the subject and was aware of his mental illness. *Id.* Similarly, in *Abbott*, the court determined that no reasonable officer could have understood a subject, who, after being tased, was lying motionless on the ground, to be actively and physically resistant. 705 F.3d 732–33.

Plaintiff argues that "[t]his case turns entirely on whether . . . a reasonable officer would have perceived [Plaintiff] to have stopped resisting and fleeing *at the time* Giese shot him with the [T]aser." (Docket #33 at 14). However, "[i]t's the totality of the circumstances, not the first forcible act, that determines objective reasonableness." *Cyrus*, 624 F.3d at 856. Based on the video footage, after their struggle, Plaintiff first took steps towards Giese, causing Giese to retreat, before Plaintiff turned towards his

Page 12 of 19
Case 2:19-cv-01230-JPS   Filed 03/30/21   Page 12 of 19   Document 46

family.⁶ Even assuming that Plaintiff did not intend to resist or flee, he was neither compliant nor subdued. In *Brooks v. City of Aurora, Illinois*, 653 F.3d 478, 487 (7th Cir. 2011), the Seventh Circuit held that:

> controlling law would not have communicated to a reasonable officer the illegality of applying pepper spray to an arrestee who has ceased active, physical resistance for a couple of seconds *but has not submitted to the officer's authority*, has not been taken into custody and still arguably could pose a threat of flight or further resistance.⁷

(emphasis added). By turning to face his family and walk away from Giese, Plaintiff was continuing to resist Giese's commands. In fact, one of the very family members that Plaintiff walked towards, his father, Jeff, had recently approached Giese and Plaintiff during their altercation, despite Giese's repeated commands he stay back. In light of the foregoing, the Court finds that it was not objectively unreasonable for Giese, the only officer on the scene, to believe it was lawful to use his Taser to subdue Plaintiff in this instance. Therefore, qualified immunity shields Giese from liability as to the first time he used his Taser.

---

⁶Surely, in its Order denying Defendants' motion to dismiss, the Court noted that "[Plaintiff's] additional allegations that his back was turned to Giese when Giese shot him with a taser, unprovoked, could plausibly support summary judgment in his favor on his excessive force claim without undermining his convictions." (Docket #16 at 9). However, at this juncture, the Court now has additional, undisputed facts before it that it did not have when evaluating Defendants' motion to dismiss.

⁷While pepper spray and a Taser are not the same, the Seventh Circuit appears to group the two together, determining that the use of a Taser, "like the use of pepper spray . . . generally does not constitute as much force as so-called impact weapons . . . ." *Abbott*, 705 F.3d at 726.

### 4.1.2 The Second Taser Deployment

To be sure, "the fact that an initial use of force may have been justified does not mean that all subsequent uses of that force were justified." *Abbott*, 705 F.3d at 729. However, the Court finds that Giese's second deployment of his Taser was objectively reasonable. Therefore, he did not violate Plaintiff's clearly established right in that instance.

After being tased the first time, the video footage shows Plaintiff begin to stand up, facing Giese. Giese then deployed his Taser a second time, causing Plaintiff to return to the ground. Plaintiff argues that he did not intend to resist Giese. (Docket #32 at 2). Further, Jeff claims that Plaintiff suffered a concussion as a result of the initial Taser deployment. (Docket #40-1 at 14–15). Plaintiff's actions are similar to, but not the same as, those of the plaintiff in *Dockery*, who after being tased once, "sat up, pulled the Taser prong out of his arm, and ignored the officers' instructions to lie down." 911 F.3d at 468. It is clear that an objectively reasonable officer could have perceived Plaintiff's attempt to get up after being tased, moving in Giese's direction, as an act of non-compliance.

Further, *Dockery* makes clear that intent is immaterial to a Court's evaluation of an excessive force claim. *Id.* at 463. In that case, the plaintiff argued that he was not intentionally resisting, but that he lost his balance due to his size and inflexibility, as well as his experiencing pain from being handcuffed. *Id.* He also explained that his actions after the first Taser deployment were "involuntary reactions to the shock, not intentional acts of resistance." *Id.* The Seventh Circuit explained that because "[e]xcessive force claims are evaluated against a standard of objective reasonableness . . . . [w]hether Dockery actually intended to resist" did not matter. *Id.*

Plaintiff may not have intended to get back up in Giese's direction. Nevertheless, he did. Based on the foregoing, it was not objectively unreasonable for Giese to deploy his Taser a second time because Plaintiff was not subdued. Given that the Court finds that Giese did not violate Plaintiff's clearly established right when he deployed the Taser a second time, Giese is protected from liability via qualified immunity.

### 4.2 Plaintiff's *Monell* Claim

Plaintiff also asserts a § 1983 claim against the Village (i.e., a *Monell* claim), alleging that the Village failed to adequately train and supervise its police officers regarding the use of force. (Docket #11 at 7). Plaintiff also alleges that Giese acted "within" Village Police Department policy when he employed excessive force against Plaintiff. (*Id.*)

To maintain a § 1983 claim against a municipal entity, a plaintiff must first identify a "policy or custom" attributable to governmental policymakers. *Gable v. City of Chicago*, 296 F.3d 531, 537 (7th Cir. 2002) (citing *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691–94)(1978)). This requirement serves to "distinguish acts of the municipality from acts of [its] employees . . . and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Grieveson v. Anderson*, 538 F.3d 763, 771 (7th Cir. 2008) (internal quotations and citations omitted). A "policy or custom" may take one of three forms:

> (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express [governmental] policy, is so permanent and well settled as to constitute a custom or usage with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority.

*Gable*, 296 F.3d at 537 (citation omitted). The plaintiff must also demonstrate "the requisite causation," which means that "the policy or custom was the 'moving force' behind [his] constitutional deprivation." *Id.* (quoting *Monell*, 436 U.S. at 691–94).

A plaintiff may demonstrate this "by showing a series of bad acts and inviting the court to infer from them that the policymaking level of government was bound to have noticed what was going on," and therefore, "by failing to do anything must have encouraged or at least condoned [the activity]." *Jackson v. Marion County*, 66 F.3d 151, 152 (7th Cir. 1995). The plaintiff must plead facts alleging that the "gap" in the defendant's policies reflected a decision to act unconstitutionally. *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005). In assessing whether the absence of a policy or protocol gives rise to a decision to violate a person's constitutional rights, a court will look for "evidence that there is a true municipal policy at issue, not a random event." *Id.*

Plaintiff argues that because (1) Giese's use of his Taser was unconstitutional, and (2) Giese's supervisor, Vaccaro, and fellow officer, Soens, reviewed the incident and found Giese's actions to be consistent with Village Police Department policy and training, it follows that such policy and training were unconstitutional. (Docket #33 at 15). The Court makes short work of Plaintiff's *Monell* claim on two grounds. First, while the Court acknowledges that it did not address the constitutional reasonableness of Plaintiff's excessive force claim, the Court did determine that Giese's actions are protected under the doctrine of qualified immunity. As discussed *supra*, when a defendant raises a qualified immunity defense, the plaintiff must show that the defendant violated a clearly established constitutional right. *Weinmann*, 787 F.3d at 450 (7th Cir. 2015). In this case,

Plaintiff failed to meet his burden to show that the Village violated his clearly established constitutional right. Thus, the Court cannot infer that based on Giese's conduct, Giese was acting pursuant to an unconstitutional Village policy or practice.

Second, Plaintiff has failed to show a series of bad acts suggesting a gap in policy or a failure to train. Notably, to Defendants' proposed statement of fact that Plaintiff "has no evidence of any training rules broken by Officer Giese," Plaintiff replies, "Deny. Discovery is still pending." (Docket #39 at 11). The Court reminds Plaintiff "that summary judgment is not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *H–D U.S.A., LLC*, 311 F. Supp. 3d at 1025 (internal quotations and citation omitted). Plaintiff has only proffered Giese's protected conduct as evidence that the Village has a policy or practice that caused an unproven violation of Plaintiff's rights. Because Plaintiff has failed to put forth sufficient evidence at this stage regarding his *Monell* claim, the Court grants Defendants' motion for summary judgment as to the same.

### 4.3    Plaintiff's Claim for Punitive Damages

The Court addresses Plaintiff's final claim for relief, in which he alleges that Giese acted with intentional disregard of his rights, and therefore, Plaintiff should be awarded punitive damages. (Docket #11 at 8). "[I]n the context of claims under § 1983, the standard for punitive damages is a high one." *Knight v. Kerstein*, 836 F. Supp. 2d 719, 726 (N.D. Ill. 2011). "Punitive damages are appropriate when the defendant acted wantonly and willfully, or was motivated in his actions by ill will or a desire to injure." *Hendrickson v. Cooper*, 589 F.3d 887, 894 (7th Cir. 2009) (citation

omitted); *see also Capps v. Drake*, Case No. 3:14-CV-00441-NJR-DGW, 2016 WL 6080457, at *3 (S.D. Ill. Feb. 2, 2016) (quoting *Smith v. Wade,* 461 U.S. 30, 51 (1983)) ("In order to award punitive damages in a case arising under 42 U.S.C. § 1983, Plaintiff must prove that Defendants' behavior reflects 'reckless or callous indifference' as to Plaintiff's rights.").

At this stage, Plaintiff has proffered no evidence suggesting that Giese acted willfully, wantonly, or even recklessly as to Plaintiff. Rather, in his response brief, Plaintiff baldly asserts that "a jury, having the opportunity to hear the testimony of the Kowalczuk family and other witnesses to this incident could find that no reasonable officer would have felt threatened by the Kowalczuk family." (Docket #33 at 16). Further, Plaintiff argues that Giese's actions were willful in light of the fact that Plaintiff "had given himself up and was handcuffed when he was tasered, twice." (*Id.*)

First, the Court quickly dispels Plaintiff's claim that "no reasonable officer would have felt threatened by the Kowalczuk family." (*Id.*) Giese was the only officer on the scene, outnumbered four-to-one by the Kowalczuk family. Further, he was explicitly threatened by Plaintiff's father. Second, there is no evidence that Plaintiff "gave himself up" until after he was tased a second time. It is undisputed that Plaintiff was, for the most part, non-compliant with Giese. Plaintiff admits to his non-compliance, as well as to engaging in a physical altercation with Giese. Despite his being handcuffed, Plaintiff still managed to kick and resist Giese.

Notwithstanding these facts, Plaintiff claims that there are genuine issues of material fact regarding the recklessness of Giese's actions. (Docket #33 at 16). However, Plaintiff does not point to any such disputed facts.

Again, Plaintiff must "put up or shut up" at this stage. His speculative assertions regarding what could happen should his case get to a jury are insufficient to defeat Defendants' motion for summary judgment.

5. **CONCLUSION**

Based on the foregoing, the Court will grant Defendants' motion for summary judgment, (Docket #24), as to each of Plaintiff's claims and will dismiss this case with prejudice.

Accordingly,

**IT IS ORDERED** that Defendants' motion for summary judgment (Docket #24) be and the same is hereby **GRANTED**; and

**IT IS FURTHER ORDERED** that this case be and the same is hereby **DISMISSED with prejudice**.

The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 30th day of March, 2021.

BY THE COURT:

_____
J. P. Stadtmueller
U.S. District Judge